IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BENJAMIN F. CARTER,

     Plaintiff,

     v.                            Civil Action No. 3:22cv775

MIRANDA STITH, *et al.*,

     Defendants.

## MEMORANDUM OPINION

Benjamin F. Carter, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983

action.[1] The action proceeds on Carter's Third Amended Complaint. (ECF No. 76.) Carter

names as defendants the following individuals and entity: Counselor Miranda Stith, Lt. Knight,

Warden Bailey, Hearing Officer Lawrence, Nurse Sykes, Zachary Davis of the VDOC Inmate

Discipline Unit ("VDOC IDU"), Correctional Officer ("CO") H. Burrows, the Commonwealth of

Virginia, and five John Doe defendants. The matter is before the Court on the Motions for

Summary Judgment filed by the named Defendants. (ECF Nos. 105, 111.) Because some of the

allegations in Third Amended Complaint that provide the background for Carter's claims are

omitted from the parties' evidence in support of support of their Motions for Summary Judgment

it is appropriate to briefly summarize those allegations and Carter's claims.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization and omits excessive emphasis in quotations from the parties' submissions. The Court omits any secondary citations in the quotations from the parties' submissions. The Court employs the spelling Defendant Burrows's name found in his Motion for Summary Judgment.

# I. Summary of Allegations and Claims

## A.   Summary of Allegations

### 1.   The First False Charge

Carter asserts that, while housed at the Greensville Correctional Center ("GCC"), he and Counselor Stith would always disagree on matters pertaining to his annual review.[2] (ECF No. 76, at 3–4.)  Therefore, on July 15, 2019, Carter initiated a verbal complaint, which he describes as part of GCC's grievance procedure, to have Counselor Basketville conduct his annual review. (ECF No. 76, at 4.)  Carter's complaint was approved to the extent that, on July 16, 2019, Counselor Basketville conducted Carter's annual review. (ECF No. 76, at 4.)  While Carter and Counselor Basketville were conducting his annual review, Counselor Stith rushed into the office and stated Carter "would get a charge for 'eating' her popcorn, so that [he] 'couldn't get transferred' closer to home and for requesting another counselor do [his] annual review." (ECF No. 76, at 4.)  "Later that day, on July 16, 2019, Stith wrote [Carter] a false [charge] . . . 'for stealing any persons property' which was a 100 series offense (111B) . . . .'" (ECF No. 76, at 4–5.)

### 2.   The Second False Charge

On July 17, 2019, Counselor Stith became upset when she realized that Carter had not been taken to solitary confinement. (ECF No. 76, at 5.)  Accordingly, Counselor Stith wrote another false charge against Carter, Case No. GCC-2019-3801, for approaching in a threatening manner. (ECF No. 76, at 5.)

---

[2] GCC is a Security Level 2/3 facility. (*See* ECF No. 76, at 14–15; ECF No. 137-1, ¶ 8.)

### 3. The Third False Charge and the July 18, 2019 Assault

On July 18, 2019, Counselor Stith contacted Lieutenant Stith[3] and instructed him to take

Carter to solitary confinement. (ECF No. 76, at 5–6.) Thereafter, "roughly 5 John Doe(s)" came

to Carter's cell and repeatedly punched him in the face and head in the process of moving him to

the Restrictive Housing Unit ("RHU"). (ECF No. 76, at 6–7.) Thereafter, Counselor Stith wrote

another false charge against Carter for threatening to cause bodily harm against her, Case

No. GCC-2019-3803. (ECF No. 76, at 7.)

### 4. Alleged July 26, 2019 Use of Excessive Force and the Flap Pod

On July 26, 2019 Warden Bailey ordered that Carter be brought to Unit Manager

Robertson's office in full restraints. (ECF No. 76, at 8.) Warden Bailey and Defendant Sykes

were in the office when Carter arrived. (ECF No. 76, at 8.) Carter was seated in the office and

was "non-disruptive," but Lt. Knight rushed into the office, grabbed Carter's handcuffs, yanked

them up, and slammed Carter to the floor. (ECF No. 76, at 8.) Defendant Knight and Sgt.

Nelson continued to apply pressure to Carter causing shortness of breath. (ECF No. 76, at 8–9.)

Warden Bailey then ordered that Carter "be taken to the 'flap' pod in"[4] housing unit 10. (ECF

No. 76, at 9.)

Before being taken to the flap pod, Carter was placed in a second set of shackles. (ECF

No. 76, at 9.) Carter claimed that he was "in extreme pain in [his] wrist, chest, and legs," and

begged Warden Bailey and Defendant Sykes for medical assistance. (ECF No. 76, at 9.)

---

[3] Lieutenant Stith, a correctional officer at GCC, is not a named defendant in this case.

[4] A "flap" cell is a cell that has a "'metal flap' over the window of the cell door so that the inmate cannot see out [of] the cell to correspond w[ith] anyone." (ECF No. 76 ¶ 22; *see also* ECF No. 112-3 ¶ 13.) These cells are "used for disruptive inmates within [housing unit] 10." (ECF No. 76 ¶22; *see also* ECF No. 112-3 ¶ 12.)

3

Upon arriving in the flap pod, Carter's wrists were bleeding and swollen. (ECF No. 76, at 10.) Carter begged for medical attention, but Warden Bailey told prison personnel not to give Carter anything until he said so. (ECF No. 76, at 10.) In the following days, Carter also developed an abnormal lump in his leg that caused him pain. (ECF No. 76, at 10.)

The flap cell had a flap over the window in the cell door to prevent the inmate from communicating with others. (ECF No. 76, at 9.) The flap cell lacks many amenities, such as a table, storage or electrical outlets. (ECF No. 76, at 9.) Additionally, Warden Bailey ordered that the water system in the cell be deactivated. (ECF No. 76, at 11.)

Carter did not receive medical care until July 29, 2019, when Lt. Conyers heard Carter's complaints, saw his swollen wrists, and immediately ordered that Carter be examined by a nurse. (ECF No. 76, at 11.)

### 5.    Various Institutional Infractions and Convictions

On July 30, 2019, and thereafter, Carter was taken before Hearing Officer Lawrence for a variety of institutional infractions. (ECF No. 76, at 11–13.) Defendant Lawrence denied Carter appropriate process before convicting him of these infractions. (ECF No. 76, at 11–13.)

Defendant Davis of VDOC ICU, responded to some of Carter's appeals. (ECF No. 76, at 17.) Defendant Davis acted negligently and failed to adequately investigate Carter's appeal. (ECF No. 76, at 17.)

For a variety of the convictions, CO Burrows failed to provide Carter with a written report describing the evidence relied upon for his institutional convictions. (ECF No. 76, at 21.)

4

**B.**   **Summary of Carter's Claims**

Based on the foregoing allegations, Carter makes the following claims:

Claim One    Defendant Stith violated Carter's First Amendment[5] rights when she
             retaliated against him by filling three false institutional charges against
             him on July 16, 2019 and July 17, 2019.

Claim Two    Defendants Lawrence and Defendant Burrows denied Carter due process
             for the following institutional infractions: "for case No. GCC-2019-3763
             on July 30, 2019 and case No. GCC-2019-3814," (ECF No. 76, at 20) and
             "No. GCC-2019-3763, GCC-2019-3932, and GCC-2019-3803 . . .," (ECF
             No. 76, at 21).

Claim Three  (a)  On July 18, 2019, five John Doe correctional officers violated Carter's
             Eighth Amendment[6] rights by using excessive force against Carter.

             (b)  Defendant Knight used excessive force against Carter on July 26,
             2019.

Claim Four   (a)  Defendant Sykes and Bailey were deliberately indifferent to Carter's
             serious medical needs.

             (b)  Defendant Bailey subjected Carter to conditions of confinement that
             violated the Eighth Amendment.

Claim Five   The Commonwealth of Virginia is liable for the negligent actions of
             Defendants Burrows and Davis.

Claim Six    Defendants Stith and Davis are liable for the state tort of abuse of legal
             process.

Carter demands monetary damages, declaratory relief, and injunctive relief.  By Memorandum

Opinion and Order entered on December 7, 2023, the Court dismissed without prejudice Claim

---

[5] "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const.
Amend. I.

[6] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual
punishments inflicted."  U.S. Const. amend. VIII.

3(a), against the five John Doe correctional officers because Carter failed to timely serve them. (ECF Nos. 140, 141.)

Nurse Sykes has moved for summary judgment and provided Carter with appropriate *Roseboro*[7] notice. (ECF Nos. 105, 107.) Additionally, Defendants Stith, Knight, Bailey, Lawrence, Davis, Burrows, and the Commonwealth (collectively, "the VDOC Defendants") have moved for summary judgment and provided Carter with *Roseboro* notice. (ECF Nos. 111, 113.) For the reasons articulated below, Defendant Sykes's Motion for Summary Judgment (ECF No. 105) will be GRANTED and the VDOC Defendants' Motion for Summary Judgment (ECF No. 111) will be GRANTED IN PART AND DENIED IN PART.

## II.  Summary Judgment Standard

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

---

[7] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

The VDOC Defendants ask the Court to dismiss Claims One, Three (b), Four (a), and Four (b) because Carter failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an affirmative defense, the VDOC Defendants bear the burden of pleading and proving lack of exhaustion. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

In support of her Motion for Summary Judgment, Defendant Sykes submitted: her affidavit (ECF No. 106-1); and Carter's medical records and pertinent grievance material (ECF No. 106-2). In support of their Motion for Summary Judgment, the VDOC Defendants submitted: (1) the affidavit of E. Witt, the Institutional Ombudsman at Greensville Correctional Center ("GCC"), (ECF No. 112-1, at 1–11); (2) a copy of Operating Procedure 866.1–Offender Grievance Procedure, ("Operating Procedure 866.1," ECF No. 112-1, at 12–25); and, (3) a copy

7

of Carter's grievance-related documents, (ECF No. 112-1, at 26–52).  Additionally, the VDOC

Defendants submitted the affidavit of Defendant Davis, who is employed in the Inmate

Discipline Unit of the VDOC (ECF No. 112-2); and the affidavit of Warden Bailey (ECF

No. 112-3).

       In response, Carter has offered a host of documents, including his own affidavits, which

the Court refers to by their CM/ECF designation.  Additionally, the Court granted Carter's

Motion to Compel discovery with respect to video footage and directed the VDOC Defendants to

provide a copy of the relevant video footage to the Court.  (ECF No. 142.)[8]  Thereafter, the

VDOC Defendants provided to the Court a copy of the relevant video footage and a written

description of what the video portrays.  The Court refers to this evidence by its corresponding

CM/ECF designation.

       The Court notes that none of the video evidence is of significant utility in resolving the

Motions for Summary Judgment.  The VDOC provided a total of seven videos to the Court.

(ECF No. 173, at 2–4.)  The first five videos relate to the alleged use of excessive force against

Carter's person on July 18, 2019, that was the subject of Claim Three (a) against five John Doe

correctional officers.  (*Id.* at 2–3.)  As previously noted, Claim Three (a) was dismissed without

prejudice because Carter failed to timely serve the five John Doe correctional officers.

---

[8] In a separate Memorandum Order entered contemporaneously with this Memorandum
Opinion and Order, the Court addresses a number of outstanding motions and requests filed by
Carter.  The Court has not addressed Carter's Motion for Sanctions.  The Motion for Sanctions
pertains to the alleged existence of video evidence of Defendant Knight's use of excessive force
against Carter, Claim Three (b).  This Memorandum Opinion does not address the merits of
Claim Three (b).

The two remaining videos are relevant to Claim Three (b), wherein Carter contends Lieutenant Knight used excessive force against his person in the Unit Manager's Office on July 26, 2019. (*Id.* at 3–4.) The VDOC Defendants accurately explain:

> The first video shows Plaintiff being taken from his pod before the incident with Defendant Knight and the second video is the Plaintiff entering the [Restricted Housing Unit ("RHU")] pod after the Knight incident. There is no video footage of the incident with Defendant Knight because Plaintiff was escorted to the Unit Manager's Office which is on the second floor. The second floor does not have surveillance footage—there are no surveillance cameras in the stairwell or on the route to the Unit Manager's Office (or in the office itself). No handheld camera was used since, unlike a cell extraction (where force is likely to be used), the VDOC defendants were not envisioning the likelihood of an incident occurring. Therefore the only footage ever available was the surveillance footage of the lower pod from just before the incident and after the incident. (The incident occurred at approximately 12:15 p.m.on July 26, 2019).

(ECF No. 173, at 3.)

The most relevant video, labelled GRCC 1020 HU 10 2 Lower, depicts Carter being escorted to his cell in the RHU immediately after the incident in the Unit Manager's Office. (ECF No. 167.) Although grainy, the video shows Carter walking without apparent difficulty and does not depict any individual using excessive force against Carter's person. (*Id.*) Lieutenant Knight appears in the video. (ECF No. 173, at 4.) Nurse Sykes is in the rear of the group of individuals shown, wearing blue scrubs, escorting Carter to his cell,. (ECF No. 167; ECF No. 172, at 8; ECF No. 174, at 3–4.)

Of course, the facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). The sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* At the conclusion of his Third Amended Complaint, Carter includes the following verification:

> I have read the foregoing complaint and hereby verify that the matters alleged are true, except those matters alleged on information and belief, and, as to those, I believe them to be true. I verify under penalty of perjury that the foregoing is true and correct.

(ECF No. 76, at 27.) Carter's verification is virtually identical to one that this Court previously rejected in *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, *2–3 (E.D. Va. June 1, 2011), and is substantially similar to one that the United States Court of Appeals for the Fourth Circuit found to be lacking in *Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001).[9] As such, the Court must consider the contents of Carter's Third Amended Complaint as "mere pleading allegations." *Hogge*, 2011 WL 2161100, at *3 (quoting *Walker*, 11 F. App'x at 274). Consequently, the Third Amended Complaint fails to constitute admissible evidence. *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

In light of the foregoing principles and submissions, the following facts are established for the purposes of the pending Motions for Summary Judgment. All permissible inferences are drawn in favor of Carter.

---

[9] Where a verification is made "upon information and belief," it "is insufficient for the purposes of opposing a motion for summary judgment because such verification avoids the possibility of perjury." *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991); *see also Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998) (citations omitted) ("Because [the court] cannot assess whether [the plaintiff] had first-hand knowledge of [the alleged] facts or whether he is competent to testify to them, [the court] cannot consider them in [its summary judgment] review.").

### III.  Relevant Facts

Carter was incarcerated at GCC from July 24, 2018 until August 16, 2019.  (ECF

No. 112-3 ¶ 3.)

### A.     Facts Relevant to Carter's Exhaustion of Remedies

### 1.     The Grievance Procedure

Offenders receive an orientation to the grievance procedure system when they arrive at a

VDOC facility.  *See* Operating Procedure § 866.1.IV.A.4.  Generally, most matters are grievable,

including, as pertinent here:

a. . . . .

b. Actions of individual employees and/or offenders which affect the grievant
personally, including any denial of access to the grievance procedure

c. Reprisals against the grievant for filing a grievance or grievance appeal

(*Id.* § 866.1.IV.M.1.)  However, inmates may not file grievances regarding "[d]isciplinary

hearing decisions, penalties and/or procedural errors, which may be appealed in accordance with

Operating Procedure 861.1, *Offender Discipline, Institutions*."  (*Id.* at § 866.1.IV.M.2.a.)

Operating Procedure § 866.1 requires that, before submitting a formal grievance, the

inmate must demonstrate that he or she has made a good faith effort to resolve the grievance

informally through the institutional procedures available to secure institutional services or

resolve complaints.  *See id.* at § 866.1.V.A.  Generally, a good faith effort requires the inmate to

submit an informal complaint form.  *See id.* at § 866.1.V.A.1–2.

"The original *Regular Grievance* (no photocopies or carbon copies) should be submitted

by the offender through the facility mail system to the Facility Unit Head's Office for processing

by the Institutional Ombudsman/Grievance Coordinator."  *See id.* at § 866.1.VI.A.2.b.  The

offender must attach to the regular grievance a copy of the informal complaint or other

11

documentation demonstrating their attempt to informally resolve the issue. *Id.* at
§ 866.1.VI.A.2.a. Additionally, "[i]f 15 calendar days have expired from the date the *Informal*
*Complaint* was logged without the offender receiving a response, the offender may submit a
*Grievance* on the issue and attach the *Informal Complaint* receipt as documentation of the
attempt to resolve the issue informally." *Id.* at § 866.1.V.A.3. A formal grievance must be filed
within thirty days from the date of the incident or occurrence, or the discovery of the incident or
occurrence, except in instances beyond the offender's control. *Id.* at § 866.1.VI.A.1.

<strong>a.     Grievance Intake Procedure</strong>

Prior to review of the substance of a grievance, prison officials conduct an "intake"
review of the grievance to assure that it meets the published criteria for acceptance. *Id.* at
§ 866.1.VI.B. For example, as pertinent here, "[o]nly one issue per grievance form will be
addressed. The offender is to write the issue in the space provided on the *Regular Grievance*,
preferably in ink." *Id.* at § 866.1.VI.A.2.a. A grievance meeting the criteria for acceptance is
logged in on the day it is received, and a "Grievance Receipt" is issued to the inmate within two
days. *Id.* at § 866.1.VI.B.3. If the grievance does not meet the criteria for acceptance, prison
officials complete the "Intake" section of the grievance and return the grievance to the inmate
within two working days. *Id.* at § 866.1.VI.B.4. If the inmate desires a review of the intake
decision, he or she must send the grievance form to the Regional Ombudsman within five
calendar days of receipt. *Id.* at § 866.1.VI.B.5. "If a Regular Grievance does not meet the
criteria for acceptance and review by the Regional Ombudsman does not result in intake into the
grievance process, the issue must be resubmitted in accordance with the criteria for acceptance."
*Id.* at § 866.1.IV.O(b). Finally, "[t]he exhaustion of remedies requirement will be met only when

12

the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue." *Id.*

### b.    Grievance Appeals

Up to three levels of review exist for a regular grievance. *Id.* at § 866.1.VI.C.  The Facility Unit Head of the facility in which the offender is confined is responsible for Level I review. *See id.* at § 866.1.VI.C.1.  If the offender is dissatisfied with the determination at Level I, he or she may appeal the decision to Level II, which is conducted by the Regional Administrator, the Health Services Director, the Superintendent for Education, or the Chief of Operations for Offender Management Services. *See id* at § 866.1.VI.C.2.  The Level II response informs the offender whether he or she "qualifies for" an appeal to Level III. *Id.* at § 866.1.VI.C.2.g.

### 2.    Facts Pertaining to Carter's Efforts at Exhaustion for Claim One

### a.    Grievance Material Possibly Related to First False Charge

Carter filed two informal complaints on July 26, 2019.  In the first informal complaint, Carter stated, "On 4-16-19, Counselor Stith gave me a charge for eating popcorn along with another inmate, but the other inmate wasn't charged with a 111 for stealing." (ECF No. 112-1, at 26.)[10]  Carter suggested that Stith filed this charge in retaliation for Carter "not being at her liking during [his] annual" review. (ECF No. 112-1, at 26.)  Counsel Stith responded on July 31, 2019: "Yes, a charge was writing for you coming into my office . . . . You reached in my

---

[10] Carter states that "[t]he grievances and complaints that I dated '4-16-19 4pm-5pm' and '4-18-19 12:30' . . . were a mistaken date as to the incident date, and was meant to be '7-16-19' and '7-18-19.'" (ECF No. 121-7 ¶ 11.)

popcorn bag got popcorn out and started to put in your mouth.  That is why the charge was written."[11]  (ECF No. 112-1, at 26.)

Thereafter, on August 15, 2019, Carter filed a regular grievance regarding Counselor Stith concerning this incident, which Carter stated took place "4-16-19: 4pm-5pm."  (ECF No. 112-1, at 27.)  Carter explicitly stated, "I am not grieving the disciplinary offense . . . ."  (ECF No. 112-1, at 27.)  Rather, he stated he was grieving the fact that during his annual review, Counselor Stith said "she wasn't of my liking."  (ECF No. 112-1, at 27 (some quotation marks omitted).)  Carter asserted that "Counselor M. Stith needs to be disciplined for her personal vendetta against me as my behavior log will show and abusing her authority by giving me a charge afterwards.  So I'm grieving her comments and not the disciplinary charge for eating popcorn."  (ECF No. 112-1, at 27.)  The grievance was rejected at intake because, based on the April date of the offense Carter gave, it was not filed within thirty days of the date the incident allegedly occurred.  (ECF No. 112-1, at 28.)  Carter did not file an appeal of that decision or indicate that he had written the incorrect date on his original grievance.

### b.     Grievance Material Possibly Related to the Second False Charge

In his second informal complaint filed on July 26, 2019, Carter stated:

> On 4-18-19, Counselor M. Stith told the Unit Manager Springs to take me to the hole without any paperwork being filed at 12:30.  There was a 129 charge that Springs didn't approve due to insufficient reasoning.  I was extracted by force . . . without any reason for strike force to restrain me other than Counselor M. Stith using "friendships" to have what she wanted . . . ."

---

[11] Mr. Carter's ire about being charged for stealing—and later taking any other person's property—for grabbing and eating popcorn out of another person's bag seems understandable. Nonetheless, Mr. Carter's frustration does not provide license to break or disregard other prison rules.

(ECF No. 112-1, at 29.)[12] Unit Manager Spring responded: "After review, the 129 infraction was not processed, and it was rewritten as a 212 infraction." (ECF No. 112-1, at 29.)

In a grievance dated August 9, 2019, Carter stated, in pertinent part:

> On 4-18-19, I was extracted by force w/o any reason charge being approved to do so. I was extracted by force at 12:30 p.m. on 4-18-19. There was no charge even written and approved to so and the paperwork will show. . . . There was no charge written until 2:37 p.m. by Counselor M. Stith and it wasn't approved until 3:20 p.m., so why was force used 3 hours prior to any offense report? . . . . It was because Counselor M. Stith has a personal vendetta against me and used "friendships" to get [Officer-in-Charge] to approve bogus charges . . . ."

(ECF No. 112-1, at 30.) The grievance was rejected at intake because, again based on the April date Carter listed, it was not filed within thirty days of the date the incident allegedly occurred. (ECF No. 112-1, at 31.) Carter did not file an appeal of that intake decision or indicate to prison officials that he had written the incorrect date on his grievance material.

### 3.   Facts Pertaining to Carter's Efforts at Exhaustion of Claim Three (b)

On July 29, 2019, Carter submitted three informal complaints. In the first informal complaint filed on that date, Carter stated that Lt. Knight had applied his handcuffs too tightly and that he was "slammed to the floor for nothing." (ECF No. 112-1, at 39.) Lt. Knight responded, "I did not grab[] this offender or slam[] him to the floor. This is false information." (ECF No. 112-1, at 39.)

In a grievance dated August 2, 2019, Carter complained that he "was taken to the floor with force" by Lt. Knight. (ECF No. 112-1, at 43.) After an investigation, on August 22, 2019, Assistant Warden Putney responded that, *inter alia*, "You were not slammed to the floor. . . . you were charged with a code 218/298B, Attempting to commit/Fighting with any Person."

---

[12] Once again, Carter states he made a mistake on his grievance material that the incident took place in April of 2019, but that they actually occurred in July of 2019. (ECF No. 121-7 ¶ 11.)

(ECF No. 112-1, at 41.)  Prison personnel sent their response to Carter on August 23, 2019. (ECF No. 112-1, at 40.)

Carter contends that he received that response on August 28, 2019, six days after the decision was made, and filed his appeal to the Regional Ombudsman that same day.  (ECF No. 4-1, at 40;[13] ECF No. 121-7 ¶ 9.)  Nevertheless, the Regional Ombudsman rejected the appeal as untimely and stated: "Your appeal receipted in this office on September 6, 2019, exceeded the five (5)-calendar day time limit.  It was sent to you on August 23, 2019." (ECF No. 112-1, at 40.)

### 4.     Facts Pertaining to Carter's Efforts at Exhaustion for Claim Four (a)

On July 29, 2019, Carter submitted a second informal complaint in which he complained that he had cuts on his wrists, and his wrist were still swollen from restraints placed on him on July 26, 2019.  (ECF No. 112-1, at 33.)  Carter further complained that Warden Bailey had told Lt. Knight "to not let medical see" Carter.  (ECF No. 112-1, at 33.)  Nurse Sykes responded that "[d]ue to your aggressive behavior, you were assessed at the cell. . . .   There were no visible marks noted at that time [and] you had go[od] range of motion." (ECF No. 112-1, at 33.)

In a regular grievance, dated August 2, 2019, Carter complained that he did not receive proper medical attention from when he was restrained on July 26, 2019.  (ECF No. 112-1, at 37.) Carter asserted that he did not receive medical attention, because Warden Bailey instructed Lt. Knight and his fellow officers not to provide medical attention.  (ECF No. 112-1, at 37.)  Carter asserted that Nurse Sykes lied when she said she provided medical attention.  (ECF No. 112-1, at 37.)  On August 21, 2019, after an investigation, Assistant Warden Putney, responded to the

---

[13] At one point, Carter states that he received the Level I response on August 29, 2019. (ECF No. 4-1, at 40.)

grievance and deemed it unfounded. (ECF No. 112-1, at 35–36.) The response to the grievance was sent to Carter on August 22, 2019. (ECF No. 112-1, at 34.)

Carter contends that he received that response on August 27, 2019, six days after the decision was made, and filed his appeal to the Regional Ombudsman that same day. (ECF No. 4-1, at 37; ECF No. 121-7 ¶ 9.) Nevertheless, the Regional Ombudsman rejected the appeal as untimely and stated: "Your appeal receipted in this office on September 6, 2019, exceeded the five (5)-calendar day time limit. It was sent to you on August 22, 2019." (ECF No. 112-1, at 34.)

### 5. Facts Pertaining to Carter's Efforts at Exhaustion for Claim 4(b)

In his third informal complaint submitted on July 29, 2019, Carter stated: "I was left in my cell for 3 days without a mattress because Warden Bailey told the crew team not to give me anything until he said so. I didn't get a mattress until Lt. Conyers brought me one on 7-29-19." (ECF No. 112-1, at 45.) Unit Manager Robinson responded to the informal complaint and stated, "you never asked or said anything about a mattress. You were combative and aggressive, reason for placement on lower 200 pod from lower 300 pod. . . ." (ECF No. 112-1, at 45.)

Thereafter, on August 5, 2019, Carter submitted a regular grievance asserting:

> [Issue One] I was restrained on 7-26-19 at 12:30 p.m. by Lt. Knight and Sgt. Nelson for nothing. UM Robertson says I was combative as the charge states, but the charge doesn't state what I did combative, because I did nothing. [Issue Two] Warden Bailey instructed the crew team, "not to give me anything, unless he said so," and he never did. I went 3 days without a mattress from 7-26-19–7-29-19. I asked every C.O. that signed their log for rounds and never received one, until 7-29-19 when Lt. Conyers pulled me from my cell to use the phone. I wasn't combative from 7-26-19–7-29-19 so why wasn't I given a "required" mattress? This was cruel and unusual punishment to me by Greensville staff because of the orders of Warden Bailey.

(ECF No. 112-1, at 46.) That same day, this grievance was rejected at intake by the Institutional Ombudsman and marked, "More than one issue—resubmit with only one issue." (ECF No. 112-

1, at 47.)  Carter appealed the intake decision rather than resubmitting anything.  (ECF No. 112-1, at 47.)  On August 19, 2019, the Regional Ombudsman rejected the appeal and marked the appeal, "[t]he intake decision is being returned to you because the 5-day time limit for review has been exceeded."  (ECF No. 112-1, at 47.)

### B.     Facts Pertaining to the Alleged Denial of Adequate Medical Care

On July 26, 2019, Warden Bailey requested that Carter to be brought to the Unit Manager's Office to meet with him due to a phone call from his family about Carter's medical care.  (ECF No. 112-3 ¶ 5.)  Warden Bailey had requested that Carter come to this office because he "cannot discuss an inmate's personal business on the pod in front of other inmates."  (ECF No. 112-3 ¶ 5.)  Nurse Sykes was present at that meeting, with Carter's medical chart, to discuss Carter's family's concerns.  (ECF No. 112-3 ¶ 5.)  Unit Manager Robertson also was present. (ECF No. 112-3 ¶¶ 5, 6.)  "There was no security staff present at the meeting."  (ECF No. 112-3 ¶ 5.)

As per standard practice for an inmate like Carter, who was confined in the Restrictive Housing Unit ("RHU"), Carter was restrained in handcuffs.  (ECF No. 112-3 ¶ 6.)  Carter became agitated when the staff refused to agree with him.  (ECF No. 112-3 ¶ 6.)  After Warden Bailey finished talking to Carter, Carter refused to leave the Unit Manager's Office.  (ECF No. 112-3 ¶ 6.)

> At that point, Unit Manager Robertson called for assistance via radio to remove Carter from the office and to escort him back to his cell.  Lt. Knight and Sgt. Nelson responded to the call for assistance.  As inmate Carter was being escorted out of the office, he became combative and refused to walk.  At that time, he had to be lowered to the floor by Lt. Knight and Sgt. Nelson.  Leg irons were placed on his left leg and right leg to gain control over him. . . .   Carter had to be removed from the office and escorted to cell 208.

(ECF No. 112-3 ¶ 6.)  According to Warden Bailey, "[n]either Lt. Knight nor Sgt. Nelson used any unnecessary force to lower Carter to the floor.   I was present and saw Lt. Knight attempt to escort Carter out of the office.  Lt. Knight did not yank Carter's handcuffs or punch or strike Carter at any time."  (ECF No. 112-3 ¶ 7.)  Warden Bailey asked Nurse Sykes "to follow Lt. Knight and Sgt. Nelson as they escorted Carter to his cell to ensure that Carter was not injured and to document her assessment accordingly."  (ECF No. 112-3 ¶ 10.)

Carter swears that "Warden Bailey was physically present while I yelled for medical treatment on July 26, 2019, the entire escort from [the Unit Manager's] Office to cell 208 and ordered me not to receive 'anything' including medical treatment in front of Sykes . . . ."  (ECF No. 121-7 ¶ 1.)[14]  Carter contends that Lt. Knight's use of force "caused my wrist, hand, and leg to swell, be cut[] by metal cuffs, and cause loss of blood circulation to my wrist, and deformity in my leg (left)."  (ECF No. 121-7 ¶ 1.)

Carter contends that he "never committed any acts of aggression on July 26, 2019, towards anyone."  (ECF No. 121-7, ¶ 20.)[15]  Nevertheless, Carter does not dispute that he refused to leave

---

[14] Warden Bailey swears that he "did not accompany the group to the cell and continued with [his] duties as Warden. . . .  Inmate Carter did not request medical attention while in [his] presence."  (ECF No. 112-3 ¶ 10.)  Warden Bailey further swears that he never interfered with or impeded Carter's access to health care.  (ECF No. 112-3 ¶ 27.)  Nurse Sykes also swears that Carter "did not beg for medical attention during the transfer, although he did curse and make threats . . . ."  (ECF No. 106-1 ¶ 14.)  Warden Bailey also acknowledges that he "did instruct staff not to give Carter any of his personal property until his disruptive behavior had subsided."  (ECF No. 112-3 ¶ 12.)  Given these competing statements, for purposes of the Motions for Summary Judgment, the Court assumes Warden Bailey accompanied Carter to his new cell and, Carter yelled for medical care.  Furthermore, given Carter's use of quotation marks and Warden Bailey's sworn statements, the record reflects that Carter heard Warden Bailey instruct staff not to give Carter "anything," but did not hear Warden Bailey specifically instruct staff not to provide Carter with medical care.

[15] Conclusory statements that Carter was or was not "aggressive" are of little value in assessing the propriety of summary judgment.  *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) ("[a]iry generalities,

the Unit Manager's Office and this refusal required security personnel to transfer him to the RHU.

(ECF No. 106-1 ¶¶ 12– 14.)

"Due to the security risk presented by [Carter's] aggressive behavior, [Nurse Sykes]

conducted [her] medical assessment of [Carter] at his cell after the transport had been complete."

(ECF No. 106-1 ¶ 15.)[16]  Nurse Sykes contends that Carter's "threatening and aggressive

behavior prevented further assessment at that time."  (ECF No. 106-1 ¶ 15.)  Nurse Sykes

asserts that, on July 26, 2019:

> No visible marks, scrapes, redness, or bruising on [Carter's] hands or wrists
> were present, he moved all extremities, and displayed good range of motion.
> [Carter] did not complain about any injuries at the time, but he continued to act
> aggressively. There was no indication of any need for additional medical attention.
> [Nurse Sykes] informed [Carter] that he would be checked on again during the next
> medication pass.

(ECF No. 106-1 ¶ 16.)

At the next scheduled medication pass on July 26, 2019, Nurse Sykes accompanied the

nurse for the distribution of medication at Carter's cell.  (ECF No. 106-1 ¶ 17.)

> [Carter] was standing at the door of his cell, continued to move all extremities, and
> again no visible marks, scrapes, redness, or bruising were present on [Carter's]
> hands or wrists.  [Carter] was provided and accepted medications at that time.
> [Carter] made no complaints or requests for additional care and there was no
> indication of any need for further medical attention at that time.

(ECF No. 106-1 ¶ 17.)  Carter swears that,

> I did report my injuries from the July 26, 2019 use of force verbally to A. Sykes at
> pill pass that evening to my left leg, wrists, and the severe pain I was in, but she

---

conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment"). Nevertheless, from the fact that Carter cursed and refused reasonable demands, the Court has no difficulty in concluding that the record demonstrates that Carter was belligerent and that the prison staff perceived Carter to be aggressive.

[16] Carter swears that "Sykes never assessed me at my cell."  (ECF No. 120-2 ¶ 1.) Nevertheless, Carter does not dispute that Nurse Sykes accompanied him to his cell and was able to observe his injuries or lack thereof.

ignored me. . . . I did report my injuries from July 26, 2019 in a written request form on August 2, 2019 and I was placed on sick call at GCC on August 3, 2019 . . . .

(ECF No. 120-2 ¶¶ 2, 3.)

Carter "was also seen by medical providers during medication passes on July 27 and 28. He made no complaints to medical personnel during that time and began refusing his medications on July 27, 2019. He did not make any sick call requests, or other requests for medical attention, from July 26 through July 29." (ECF No. 106-1 ¶ 19.)[17] Nurse Sykes again saw Carter on July 29, 2019, and recommended 75 mg of Effexor XR and 600 mg of Advil. (ECF No. 106-1 ¶ 20.) Carter again refused medications. (ECF No. 106-1 ¶ 20.)

On July 29, 2019, Carter filed an informal complaint wherein he alleged that "he had not been treated for cuts and swelling on his wrists from the restraint done on July 26, 2019." (ECF No. 106-1 ¶ 21.) On July 30, 2019, Nurse Sykes responded:

Due to your aggressive behavior, you were assessed at the cell. Use of force incidents were made by Security. There were no visible marks noted at that time & you had go[od] range of motion. You were told that medical would check on you again during pill call. Medical has made rounds since 7/26/19 & you have not

---

[17] On summary judgment the Court is "not required to assume the truth of testimony 'so replete with inconsistencies and improbabilities that a reasonable jury could not [base a favorable finding on it].'" *Saeli v. Chautauqua Cnty., NY*, 36 F.4th 445, 457 (2d Cir. 2022) (alteration in original) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553–55 (2d Cir. 2005)). Carter makes several statements that run afoul of this principle.

For example, Carter swears that, "I never intended to refuse my medication between July 26, through July 29, 2019, purposefully, I was in pain and could barely move to the door fast enough to get the pills before the nurses would move to the next cell doing pill pass." (ECF No. 120-2 ¶ 7.) Nevertheless, during this same time period Carter vaguely suggests that he was "daily verbally reporting" his alleged injuries to someone. (ECF No. 120-2 ¶ 3.) By his own admission he was not reporting them to the nurse on pill call. In any event, it is difficult to square Carter's statements above with Carter's own statement that he attended pill pass at his cell door on July 26, 2019 and spoke to Nurse Sykes. Further, Carter offers no evidence to contradict the evidence from Nurse Sykes reflecting that, from her observations, Carter had no visible injuries and a good range of motion.

offered any complaint or submitted a sick call request to be seen.  Also, you began refusing your medication on 7/27/19.

(ECF No. 106-2, at 19.)

On August 2, 2019, Carter submitted an offender request wherein he requested a medical appointment for "a lump in [his] leg" which he had had since the "strike force" had restrained him on July 18, 2019.  (ECF No. 120-1, at 1.)  Carter complained that the lump had gotten worse since he was restrained on July 26, 2019 and deprived of a mattress.  (ECF No. 120-1, at 1.)  On August 3, 2019, medical staff responded that Carter would be scheduled for sick call.  (ECF No. 120-1, at 1.)  Staff also noted, "you failed to mention this concern about a bone sticking out during pill pass today, you only discussed wanting a tetanus shot."  (ECF No. 120-1, at 1.)

On August 7, 2019, Carter was seen by Nurse Practitioner ("NP") Alexander.  (ECF No. 123-1, at 1–2.)  Carter complained to NP Alexander that he had been experiencing right hand pain for two months and admitted to having swelling in his left leg since an altercation two weeks ago.  (ECF No. 123-1 ¶ 10.)  NP Alexander noted Carter was in no acute distress, had no bruises, and had a full range of motion.  (ECF No. 123-1 ¶ 10.)  Because Carter complained of hand and leg pain, his right hand and left leg were x-rayed.  (ECF No. 123-1 ¶ 10.)  Both x-rays were normal.  (ECF No. 123-1 ¶ 10.)

### C.   Facts Pertaining to Carter's Institutional Charges in July and August of 2019

The record reflects that of all of the charges Carter received in July and August of 2019, while confined at GCC were never served or "were dismissed, or were overturned on appeal." (ECF No. 112-2 ¶ 4.)  Specifically, the charges and dispositions were as follows:[18]

---

[18] The Court has bolded those charges that Carter claims are false and initiated by Defendant Stith (Claim One).  The Court has underlined those charges for which Carter claims Defendants Lawrence and Burrows denied him due process.

a.   July 1, 2019 - GCC-2019-3462 - Offense Code 137B Indecent Exposure. Carter was found not guilty for this charge. He received no penalty.

b.   July 14, 2019 - GCC-2019-4557 - Offense Code 129 Gathering around or approaching any person in a threatening manner. This charge was not processed, and Carter received no penalty.

c.   **July 16, 2019 - GCC 2019-3763 - Offense Code 111B Stealing state or any person's property. While Carter was initially found guilty of this charge, VDOC records reflect that the charge was overturned on appeal because Carter's appeal paperwork was mistakenly given to another inmate with a similar name. Carter was not punished with any fine or any loss of good time credits for this charge.** [This is the popcorn charge.]

d.   July 17, 2019 - GCC 2019-3782 - Offense Code 222 Vulgar/insolent language directed toward an employee. This charge was dismissed because of a failure to follow policy. Carter received no penalty.

e.   **July 17, 2019 - GCC-2019-3801 - Offense Code 129 - Gathering around or approaching any person in a threatening manner. This charge shows PENDING PENALTY OFFER, suggesting that it was approved by the OIC and subsequently was never served. Carter received no penalty.**

f.   July 18, 2019 - GCC-2019-3814 - Offense Code 102 - Possession or Use of a Weapon. This charge was ORDERED REHEARD on appeal because it was found at the first level of appeal that the Hearing Officer had failed to read a document into the record. Carter received no penalty.

g.   July 24, 2019 - GCC - 2019-3932 - Offense Code 122D - Refusal to Submit to a Drug Test. Carter was initially found guilty of this charge, but the charge was overturned on appeal for policy violations and because the reporting officer no longer worked for VDOC. Carter was not punished with any fine or any loss of good time credits for this charge.

h.   **July 17, 2019 - GCC 2019-3803 - Offense Code 212 - Threatening bodily harm to any person verbally, by gesture, by action . . . This charge was overturned because it appears that Carter's appeal paperwork may have been accidentally given to another inmate with a similar name. Carter received no penalty.**

i.   July 17, 2019 - GCC-2019-4556 - Offense Code 129 Gathering around or approaching any person in a threatening manner. This charge was not processed, and Carter received no penalty.

> j. July 18, 2019 - GCC-2019-5121 - Offense Code 102 Possession/Use of a Weapon. This charge was meant to be the rehearing for Case Number GCC-2019-3814 (4f), but the IHO dismissed the charge because the serving officer wrote conflicting dates of service on the DOR and Penalty Offer. Carter received no penalty.[19]
>
> k. July 26, 2019 - GCC-2019-3983 - Offense Code 218/298B - Attempting to commit/fighting with any person. This charge was dismissed by facility staff because Carter's actions did not meet the criteria for the charge issued. Carter received no penalty.

(ECF No. 112-2 ¶ 4. (omission in original).)

Following this spate of charges, in August of 2019, the Institutional Classification Authority ("ICA") conducted a review of Carter's status. (ECF No. 137-1 ¶ 4.) During the review,

> an inmate is assessed in a number of categories to determine an appropriate security level, appropriate good time earning level and whether the inmate meets the criteria for a transfer to another facility. The ICA reviews relevant records pertaining to the inmate and makes recommendations for a final decision regarding the inmate's status and assignments. The criteria that the ICA may consider when reviewing an inmate includes, but is not limited to[,] disciplinary infractions, employment, programming opportunities, attitude, etc.
>
> The ICA does not base its recommendation solely on an inmate's disciplinary infractions. While they are important and are a criteria that is considered, the ICA also considers a host of other criteria and factors, including the inmate's institutional adjustment, behavior and adjustment to his housing assignment. All of these factors, and others, affect the risk that an inmate may pose to a facility.

(ECF No. 137-1 ¶¶ 4, 5.)

Here, there exists undisputed evidence that Carter repeatedly refused to obey the lawful orders of correctional officials at GCC.[20] Specifically, the video footage of Carter's cell

---

[19] The VDOC Defendants fail to define the abbreviations "IHO" and "DOR."

[20] In July of 2019, Carter had a total of eleven disciplinary charges placed against him. (ECF No. 137-1 ¶ 6.) As noted above, because the disciplinary infractions were not processed or were eventually reversed, Carter did not suffer any institutional penalty. GCC's numerous procedural errors in processing these infractions should be of concern to prison officials. Here,

extraction, on July 18, 2019, shows, for an extended period of time, that Carter obdurately refused officers' reasonable requests to allow himself to be handcuffed so he could be moved. These actions by Carter required prison officials to summon a team of correctional officers to extract Carter from his cell. Additionally, on July 26, 2019, Carter refused to leave the Unit Manager's Office when asked to do so. This once again required GCC officials to summon additional staff to make Carter comply with that command.

In August of 2019, the ICA approved Carter's transfer from GCC a Level 2/3 facility to River North Correctional Center ("RNCC"), a Level 4 facility. (ECF No. 137-1 ¶¶ 8–10.) Carter was transferred to RNCC on August 16, 2019. (ECF No. 137-1 ¶ 8.) Carter remained at RNCC until January 24, 2020, at which time he was transferred to Red Onion State Prison.[21] (ECF No. 137-1 ¶ 8.) "Red Onion State Prison is a Level 5/6 facility." (ECF No. 137-1 ¶ 8.)

"Carter was transferred to RNCC based on his continued disruptive behavior, his inability to follow the facility's rules and regulations and his inability to adjust to a lower security level facility at GCC." (ECF No. 137-1 ¶ 10.) "Central Classification Services ("CCS") had the final authority for approving Carter's transfer." (ECF No. 137-1 ¶ 9.)

### IV. Analysis

The Court will address Defendants' arguments pertaining to exhaustion, prior to addressing any arguments that Carter's individual claims lack merit. For the reasons set forth

---

however, these mistakes cannot save his claim from Summary Judgment because his claims fail on other grounds.

[21] While Mr. Carter claims that his transfer to Red Onion State Prison was due to the institutional charges at GCC, it appears that the transfer, in fact, was precipitated by an incident in December 2019, at his Level 4 facility, RNCC. In December 2019, Mr. Carter, while intoxicated, attacked his cellmate and "bit off" approximately an inch and a half section of his cellmate's nose. (ECF No. 4-1, at 20–21.)

below, Claim One and Four (b) will be DISMISSED for lack of exhaustion.  Material disputes of

fact exist that preclude the dismissal of Claims Three (b) and Claim Four (a) for lack of

exhaustion.  However, Claim 4(a) cannot survive a merits analysis.  Claims Two, Five, and Six

also falter on the merits.  Therefore, Claims Two, Four (a), Five, and Six will be DISMISSED

for lack of merit and only Claim Three (b) survives the Motions for Summary Judgment.

     **A.**     <u>**Exhaustion Analysis**</u>

     The pertinent statute provides: "No action shall be brought with respect to prison

conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C. § 1997e(a).  This language "naturally requires a prisoner to exhaust the

grievance procedures offered, whether or not the possible responses cover the specific relief

the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 738 (2001).  Generally, in order to

satisfy the exhaustion requirement, an aggrieved party must file a grievance raising the claim and

pursue the grievance through all available levels of appeal, prior to bringing his or her action to

court. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  The Supreme Court has instructed that

section 1997e(a) "requires proper exhaustion." *Id.* at 93.  The Supreme Court explained that

"[p]roper exhaustion demands compliance with an agency's deadlines and other critical

procedural rules," *id.* at 90, "so that the agency addresses the issues on the merits." *Id.* (quoting

*Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).  The applicable prison rules "define

the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).  Exhaustion is

mandatory, and courts lack discretion to waive the exhaustion requirement. *Porter v. Nussle*,

534 U.S. 516, 524 (2002).

Nevertheless "an administrative remedy is not considered to have been available if a prisoner, through no fault of [their] own, was prevented from availing [themselves] of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006)).  The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).  The Supreme Court observed that, "[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." *Id.* at 643 (citing *Woodford*, 548 U.S. at 102).

"When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.* at 644.  The United States Court of Appeals for the Seventh Circuit quoted the foregoing language to conclude that, when "refiling" an initially defective grievance, "was available to [an inmate, the inmate's] failure to exhaust is not excusable." *Haywood v. Baylor*, 804 F. App'x 401, 403 (7th Cir. 2020) (citing *Kaba*, 458 F.3d at 684); *accord Wall v. Stevens*, No. 7:16–CV–00373, 2019 WL 1371858, at *4 (W.D. Va. Mar. 26, 2019), *aff'd*, 775 F. App'x 761 (4th Cir. 2019); *see Woodford*, 548 U.S. at 90 (emphasis added) (internal quotation marks omitted) (emphasizing that proper exhaustion entails "using all steps that the agency holds out"); *Wilson v. Jamrog*, No. 98–2281, 2000 WL 145455, at *2 (6th Cir. Feb. 1, 2000) (observing that inmate could have exhausted his claims "simply by following the direction[s]").

## 1. **Carter Failed to Exhaust His Administrative Remedies for Claim One**

In Claim One, Carter claims Defendant Stith retaliated against him by filing false charges against him after he filed a verbal complaint in order to have someone else conduct his annual review.   Carter, however, failed to properly exhaust his administrative remedies with respect to this claim.  Although he filed two regular grievances related to Defendant Stith's alleged retaliation, the face of the grievances indicated that were file outside of the thirty-day filing period and thus were rejected at intake. *See Edwards v. Scarberry*, No. 7:18CV373, 2019 WL 3797374, at *3 (W.D. Va. Aug. 12, 2019) (citations omitted) (observing that the "untimely filing of a grievance is not 'proper exhaustion' of available administrative remedies under § 1997e(a)").  Carter did not refile.  Because Carter never submitted a grievance that was accepted in the grievance process as timely and proper, he has failed to exhaust his administrative remedies with respect to Claim One.

Carter contends that because his complaint related to false and retaliatory disciplinary charges his claim is not grievable.  Carter is wrong.  "[A]lthough disciplinary convictions themselves are not grievable and have a separate appeal process, a claim that a particular officer brought a disciplinary charge to retaliate against an inmate for engaging in protected activity is a grievable issue." *Ofori v. Fleming*, No. 7:20-CV-00345, 2022 WL 791645, at *5 (W.D. Va. Mar. 11, 2022) (citation omitted).[22]  Accordingly, Claim One will be DISMISSED because Carter failed to properly exhaust his administrative remedies.

---

[22] In the present action, unlike *Ofori*, Carter has not presented evidence that prison officials told him he could not grieve his retaliation claims because they pertained to disciplinary infractions.

### 2. A Material Dispute of Fact Precludes Dismissal of Claims Three (b) and Four (a) for Lack of Exhaustion

Lieutenant Knight contends that Claim Three (b), concerning his alleged use of excessive force against Carter, on July 26, 2019, should be dismissed for lack of exhaustion. Specifically, Lieutenant Knight contends that Carter failed to timely appeal the denial of his regular grievance to Level II, during the five-day appeal period. (ECF No. 112, at 12.) Similarly, Warden Bailey contends that Claim Four (a)[23] against him, should be dismissed because Carter failed to timely appeal the denial of his regular grievance to Level II during the five-day appeal period. (ECF No. 112, at 13.) Lieutenant Knight and Warden Bailey anchor their claim on untimeliness on the date prison officials *sent* the Level I response to Carter and the date prison officials *received* Carter's Level II appeal.[24] Carter, however, has sworn that, in both instances he filed his appeal on the same day that he received his Level I response. (ECF No. 121-7, at 4; ECF No. 4-1, at 37, 40.)

---

[23] Claim Four (a) does not survive on the merits. *See infra* Section IV.B.2.

[24] The Supreme Court of Virginia has rejected the VDOC's interpretation of the relevant procedures. *See AlBritton v. Commonwealth*, 853 S.E.2d 512, 517 (Va. 2021) (citation omitted) (rejecting the VDOC's argument that "grievance appeals are 'submitted for purposes of exhaustion when they are *received* by VDOC, not when they are *sent*'"). Specifically, the Supreme Court of Virginia stated:

> We believe that the most reasonable interpretation of these provisions is that an inmate may timely send a Level II grievance appeal by placing it in the prison mailing system and that by doing so, the inmate has "appeal[ed]" the grievance "to the next level." The Commonwealth's contrary interpretation — that the inmate can only meet the five-day deadline when the DOC date-stamps its receipt of the grievance on or before day five — exposes the inmate to a risk over which he has no control. Under this interpretation, an inmate could deposit his grievance in the prison mailing system on day one and still be forever barred from pursuing the claim further in either administrative or judicial forums if the grievance was, for whatever reason, received on day six.

*Id.* (alteration in original) (citation omitted).

Prisoners are only required to exhaust administrative remedies that are available. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of [their] own, was prevented from availing [themselves] of it." *Moore*, 517 F.3d at 725 (citing *Aquilar–Avellaveda*, 478 F.3d at 1225; *Kaba*, 458 F.3d at 684). That appears to be the case here. According to Carter, an appeal to Level II was not available, because even though he filed his appeals on the very same day he *received* his Level I response, the appeals were deemed to be untimely. It is possible, from this record, that Carter did not receive the decision until near or after the appeal period had passed. Accordingly, the Court denies the Motion for Summary Judgment on the ground that Carter failed to exhaust his administrative remedies for Claims Three (b) and Four (a).

### 3.    Carter Failed to Exhaust His Administrative Remedies for Claim Four (b)

In Claim Four (b), Carter asserts that Warden Bailey subjected him to unconstitutional conditions of confinement following the July 26, 2019 encounter in the Unit Manager's Office. Although Carter submitted a regular grievance related to this issue, it was rejected at intake because he also complained about his alleged unnecessary restraint in the Unit Manager's Office. (ECF No. 112-1, at 46–47.) Carter was directed to "resubmit with only one issue." (ECF No. 112-1, at 47.)

Because Carter failed to do so, his complaint was not addressed on its merits as is required for proper exhaustion. *See Nelson v. Ellis*, No. 3:20CV803, 2023 WL 2226790, at *8 (E.D. Va. Feb. 24, 2023) (concluding inmate did not properly exhaust administrative remedies when he failed to resubmit a grievance limited to a single issue); *see also Woodford*, 548 U.S. at 90 (emphasis in original) (explaining that an inmate must use administrative remedies "*properly*

30

(so that the agency addresses the issues on the merits)."). Accordingly, Claim Four (b) will be DISMISSED for lack of exhaustion.

### B.   **Merits Analysis**

#### 1.   **Claim Two**

In Claim Two, Carter maintains that he was denied due process in relation to a variety of institutional charges. The VDOC Defendants assert that, ultimately, none of the charges resulted in a penalty, so Carter never suffered the deprivation of a liberty interest. Carter responds that these infractions resulted in an increased security level, a less favorable good-time level, and a transfer to a higher security prison. As explained below, because Carter fails to demonstrate he has protected liberty interest in his security level, his prospective good-time level, or remaining at a particular prison, his claim must be dismissed.

The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. *See Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569–70 (1972). Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected liberty or property interest. *Beverati v. Smith,* 120 F.3d 500, 502 (4th Cir. 1997) (citations omitted). A liberty interest may arise from the Constitution itself, or from state laws and policies. *See Wilkinson v. Austin*, 545 U.S. 209, 220–21 (2005).

"The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson*, 545 U.S. at 221 (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)); *Paoli v. Lally*, 812 F.2d

31

1489, 1492 (4th Cir. 1987) (citations omitted) ("A transfer of a prisoner from one institution to another, of course, does not implicate a liberty interest in the absence of a state statute or regulation that creates such an interest."). Further, "Virginia prisoners have no liberty interest in any classification or good conduct time earning rate derived from the United States Constitution." *Henderson v. Clarke*, No. 1:21CV 672 (TSE/JFA), 2022 WL 16922818, at *7 (E.D. Va. Nov. 14, 2022) (citing *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974); *Mills v. Holmes*, 95 F. Supp. 3d 924, 931–34 (E.D. Va. 2015)). Accordingly, Carter fails to demonstrate that the Constitution confers a liberty interest in remaining in a particular prison, retaining a security classification, or retaining a good-time level classification.

To establish a state-created liberty interest, Carter "must make a threshold showing that the deprivation imposed amounts to an 'atypical and significant hardship' or that it 'inevitably affect[s] the duration of his sentence.'" *Puranda v. Johnson*, No. 3:08CV687, 2009 WL 3175629, at *4 (E.D. Va. Sept. 30, 2009) (alteration in original) (quoting *Sandin*, 515 U.S. at 484, 487). If Carter makes this threshold showing, he must then identify the state regulatory or statutory language that creates a protected liberty interest in remaining in a particular prison, retaining a particular security classification, or good time-level classification. *See id.* Here, the Court proceeds directly to the second step of the analysis because Carter fails to demonstrate that any state statutory or regulatory language creates a liberty interest in remaining a particular prison, security classification, or good-time level classification. "Virginia inmates have no . . . state-created right to be classified at a particular security level or to be housed in a specific penal institution." *Carter v. Stith*, No. 1:21CV307 (LO/IDD), 2022 WL 6167352, at *3 (E.D. Va. Oct. 6, 2022) (citing *McKune v. Lile*, 536 U.S. 24, 39 (2002); *Meachum v. Fano*, 427 U.S. 215, 225

(1976); *Waters v. Bass*, 304 F. Supp. 2d 802, 805 (E.D. Va. 2004); *Black v. Willis*,

No. 2:02cv370, 2003 WL 23194275, at *4 (E.D. Va. Jan. 21, 2003)).

Further, "it is well established that Virginia inmates do not enjoy a protected liberty

interest in the rate at which they earn either Earned Sentence Credits or Good Conduct

Allowances." *Sydnor v. Mahon*, No. 3:10CV780–HEH, 2012 WL 604039, at *4 (E.D. Va. Feb.

23, 2012) (citing *Sazynski v. Clarke*, No. 2:10CV156, 2011 WL 586973, at *3 (E.D. Va. Feb. 8,

2011)); *see also Puranda,* 2009 WL 3175629, at * 5; *Martin v. Johnson*, No. 7:08–cv–00249,

2008 WL 957869, at *4 (W.D. Va. Apr. 8, 2008); *DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 330

(E.D. Va. 2000); *Gaskins v. Johnson*, 443 F. Supp. 2d 800, 805 (E.D. Va. 2006)).  Accordingly,

Claim Two will be DISMISSED.

### 2.    Claim Four (a)

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff

must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently

serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of

mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501

U.S. 294, 298 (1991)).  With respect to claims of inadequate medical treatment under the Eighth

Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*,

145 F.3d at 167.  A medical need is "serious" if it "has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting

*Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F.

App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

Furthermore, where, as here, an Eighth Amendment claim is predicated on a delay in the

provision of medical care, the plaintiff must allege facts that suggest "that the delay resulted in substantial harm." *Webb*, 281 F. App'x 166–67 & n.13 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In Claim Four (a), Carter contends that he was denied medical care after Lieutenant Knight used excessive force against him in the Unit Manager's Office on July 26, 2019. Although Carter swears that he demanded medical care, a fact disputed by Warden Bailey and Nurse Sykes, Carter fails to adduce evidence that he had a serious medical need for medical attention.  Neither Warden Bailey nor Nurse Sykes observed any conduct that indicated Carter required medical attention.  According to Nurse Sykes, after Carter's removal from the Unit Manager's Office:

> No visible marks, scrapes, redness, or bruising on [Carter's] hands or wrists were present, he moved all extremities, and displayed good range of motion. [Carter] did not complain about any injuries at the time, but he continued to act aggressively.  There was no indication of any need for additional medical attention.

(ECF No. 106-1 ¶ 16.)  Accordingly, especially given his inconsistent "factual" allegations to the contrary, Carter fails to demonstrate that he had a serious medical need for medical attention immediately following his removal from the Unit Manager's Office.

Furthermore, Carter fails to demonstrate that either Warden Bailey or Nurse Sykes acted with deliberate indifference immediately after Carter was removed from the Unit Manager's Office.  Warden Bailey instructed Nurse Sykes to accompany Carter to his cell to assure Carter did not require any medical attention.  Even though Carter may have yelled that he required medical attention, absent plain evidence that he did, Warden Bailey was entitled to rely upon the assessment of Nurse Sykes. *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008)  ("If a prisoner is under the care of medical experts . . ., a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))).  As noted above, Nurse Sykes's assessment of Carter reflected that he did not have visible injuries, limited movement, or required medical attention.  Warden Bailey had no further

35

interaction with Carter in the immediate aftermath of Carter's removal from the Unit Manager's Office. Therefore, Claim Four (a) against Warden Bailey will be DISMISSED.

Nurse Sykes, however, continued to interact with Carter that evening and over the next several days. On the evening of July 26, 2019, Nurse Sykes accompanied the nurse on duty to Carter's cell during pill call. According to Carter,[25] at this time, he "did report [his] injuries from the July 26, 2019 use of force verbally to A. Sykes at pill pass that evening to [his] left leg, wrists, and the severe pain [he] was in, but she ignored [him]." (ECF No. 120-2 ¶ 2.) Nevertheless, at this time, "[Carter] was standing at the door of his cell, continued to move all extremities, and again no visible marks, scrapes, redness, or bruising were present on [Carter's] hands or wrists." (ECF No. 106-1 ¶ 17.) Furthermore, the Nurse Practitioner's examination of Carter on August 7, 2019, indicated that Carter was in no acute distress, had no bruises, and had a full range of motion. (ECF No. 123-1 ¶ 10.) X-rays of Carter's hand and leg did not reveal any injury. (ECF No. 123-1 ¶ 10.)

Based on this record, Carter fails to demonstrate he had serious need for medical attention for any injuries allegedly sustained in his removal from the Unit Manager's Office. Moreover, at most, Nurse Sykes delayed Carter's access to further medical care from other individuals. Carter fails to demonstrate that this delay resulted in any substantial harm to his person. *See Webb*, 281 F. App'x 166–67 & n.13 (quoting *Sealock*, 218 F.3d at 1210). Accordingly, Carter fails to satisfy the objective component for this Eighth Amendment claim. Further, Carter fails to demonstrate that, subjectively, Nurse Sykes acted with deliberate indifference. The record bears out Nurse Sykes's observations that Carter did not require

---

[25] Nurse Sykes swears that Carter made no complaints or requests for care. (ECF No. 106-1 ¶ 17.)

medical treatment in the wake of his removal from the Unit Manager's Office.  Therefore, because Carter fails to demonstrate deliberate indifference, Claim Four (a) against Nurse Sykes will be DISMISSED.

### 3.    <u>Claim Five</u>

In Claim Five, Carter contends that the Commonwealth of Virginia is liable for the negligence of Defendants Burrows and Davis.  The United States Supreme Court has said that, pursuant to the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984)).  Virginia has not waived sovereign immunity for claims of negligence.  *See Patterson v. City of Danville*, 875 S.E.2d 65, 75 (Va. 2022).[26] Accordingly, Claim Five will be DISMISSED.

---

[26] In his Affidavit in Opposition to the VDOC Defendants' Motion for Summary Judgment, Carter appears to attempt to amend the relevant defendants for this claim.  (ECF No. 121-7 ¶ 28.)  Carter cannot amend his claim in this manner.  "[I]t is axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mylan Labs, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)).

### 4.    Claim Six

In Claim Six, Carter contends that Defendants Stith and Davis are liable for the state tort of abuse of legal process. The Supreme Court of Virginia has described abuse of process as:

> the misuse of a *legal process* to accomplish some purpose not warranted or commanded by the writ, a malicious perversion of a regularly issued civil or criminal process for a purpose and to obtain a result not lawfully warranted or properly attainable thereby. *It is the misuse of the power of the court, an act done in the name of the court and under its authority for the purpose of perpetrating an injustice.* Abuse of process, as distinguished from that of malicious prosecution, involves the malicious misuse or perversion of the process, *after its issuance*, for an end not lawfully warranted by it.

*Eubank v. Thomas*, 861 S.E.2d 397, 403 (Va. 2021) (first and second emphasis added) (citation omitted). "To prevail in a cause of action for abuse of process, a plaintiff must plead and prove: '(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings.'" *Id.* (quoting *Donohoe Const. Co. v. Mount Vernon Assocs.*, 369 S.E.2d 857, 862 (Va. 1988)). "The term 'process' in this context means specific legal procedures enforced by judicial authority." *Id.* "[A]buse of process claims arise when litigants misuse individual legal procedures, such as discovery, subpoenas, and attachment, after a lawsuit has been filed." *Id.* (citing *Advanced Constr. Corp. v. Pilecki*, 901 A.2d 189, 197 (Me. 2006)).

Here, Carter's claim of abuse of process involves allegedly improper prison disciplinary proceedings. These are not legal procedures enforced by a judicial authority covered by this tort. *See id.*; *Ubl v. Kachouroff*, 937 F. Supp. 2d 765, 770 (E.D. Va. 2013) (alteration in original) ("[T]he process that is envisioned in the cause of action for abuse of process is one of a legal nature and is one that might arise out of some kind of writ." (quoting *Atkins v. Ritchie*, No. LC–116, 1980 WL 143159, at *2 (Va. Cir. Ct. Nov. 6, 1980))); *Neil v. Wells Fargo Bank*, No. 1:13-

CV-0644, 2015 WL 4459090, at *4 (E.D. Va. July 20, 2015) ("'Process,' as used in this sense, is synonymous with 'legal process' or 'judicial process,' and refers to a compulsory issuance by a court." (citing *Ross v. Peck Iron & Metal Co.,* 264 F.2d 262, 267–68 (4th Cir.1959); *Donohoe,* 369 S.E.2d at 862; *Glidewell v. Murray–Lacy & Co.*, 98 S.E. 665, 670 (Va. 1919))), *aff'd*, 686 F. App'x 213 (4th Cir. 2017); *Cent. Radio Co., Inc. v. Warwick Builders, LLC*, CL20-8580, 2021 WL 8775677, at *2 (Va. Cir. Ct. June 28, 2021) ("In the absence of a suit to enforce, as in this case, where a claimant has not served the other party with a complaint and summons, the mere filing of a mechanic's lien alone does not a constitute "process."). Further, Carter fails to demonstrate either Defendant Stith or Davis committed an "act in the use of the process not proper in the regular prosecution of the proceedings." *Eubank*, 861 S.E.2d at 403 (citation omitted). Accordingly, Claim Six will be DISMISSED.

## V. Conclusion

Nurse Sykes's Motion for Summary Judgment (ECF No. 105) will be GRANTED. The VDOC Defendants' Motion for Summary Judgment (ECF No. 111) will be GRANTED IN PART AND DENIED IN PART. Claims One, Two, Four (a), Four (b), Five, and Six will be DISMISSED.

Carter has filed a request for injunctive relief related to Claim Two. (ECF No. 146.) Carter's asserts that he is entitled to a transfer, a change in his security level, and a change in his good time earning level. This assertion lacks merit for the reasons stated above in conjunction

with the dismissal of Claim Two.  Accordingly, Carter's request for injunctive relief, (ECF No. 146), will be DENIED.

An appropriate Order will accompany this Memorandum Opinion.


Date: 02/07/2024
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge

40